**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **MOCAP INCORPORATED, et al.,** ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | Case No. 4:06CV323MLM |
| ) | |
| **SINCLAIR & RUSH, INC.,** ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

Before the court is the Motion for Summary Judgment to Enforce Settlement Agreement filed by Plaintiffs MOCAP Incorporated, Protective Industries, Inc., Harman Corporation, and Alliance Plastics (jointly, "Plaintiffs"). Doc. 42. Defendant Sinclair & Rush, Inc., ("Defendant") filed a Response. Doc. 51. Plaintiffs filed a Reply. Doc. 54. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636. Doc. 20.

**UNDISPUTED FACTS**[1]

On or about August 1, 1997, Defendant filed an Application, serial number 75334728, (the "Application") in the United States Patent and Trademark Office ("USPTO") for federal registration of a trademark described, in part, as follows: "The mark consists of a colored distinctly visible longer inner continuous liner projecting from one end of a contrasting colored outer continuous surrounding shell in an inner liner/outer shell hand grip." Pl. Ex. 1A. On November 16, 1999, the Application was published by the USPTO for purposes of allowing opposition before registration. After publication of the Application, Plaintiffs each timely filed an opposition with the USPTO's Trademark Trial and Appeal Board ("TTAB"). The parties entered into settlement negotiations in an attempt

---

[1] The facts are undisputed unless otherwise stated.

to resolve the opposition proceedings as early as 2000. On January 14, 2003, Plaintiffs' oppositions were consolidated into Opposition No. 91116787. After consolidation of the oppositions, the parties continued settlement negotiations, and, for the express purpose of allowing these settlement negotiations to continue, filed at least three joint requests for suspension of the opposition.

Via e-mail dated March 5, 2004, Defendant's counsel sent what he called a "Draft License Agreement" to Plaintiffs' counsel. In the e-mail Defendant's counsel stated that the Draft License Agreement was "along the lines we discussed." The March 5, 2004 Draft License Agreement, among other things, provided that Defendant would grant to Plaintiffs a non-exclusive, royalty-free licence to use the trademark of the Application in consideration for Plaintiffs' dismissing the pending oppositions against the Application. In the upper right hand corner of each page of the Draft License Agreement appeared the word "**DRAFT.**" Pl. Ex. 1-J.

On or about July 14, 2005, counsel for Plaintiffs sent a revised draft agreement via e-mail to Defendant's counsel. In the July 14, 2005 e-mail Plaintiffs' counsel said, among other things, that when he and Defendant's counsel last talked they arranged for a joint suspension of the consolidated trademark opposition to Defendant's "clerical collar" mark; that "the opposition was scheduled to resume in just over a month"; that "[i]n light of that date, [Plaintiffs] took the initiative to revise the [D]raft [L]icense [A]greement previously discussed by the parties for settlement of the opposition"; and that "review of this agreement has not been completed by all Licensees." In the July 14, 2005 e-mail Plaintiffs' counsel further stated, "[p]lease let us know of any significant comments from [Defendant] so that the parties may move forward with this agreement." In the upper right hand corner of each page of the Draft License Agreement sent via e-mail on July 14, 2005 appears the word "**DRAFT.**" Pl. Ex. 1-K.

2

On July 25, 2005, counsel for Defendant stated in an e-mail to Plaintiffs' counsel that the revised or second draft agreement was "substantially as [we] had discussed several months ago on the phone" but that a change was required to a confidentiality provision in the revised or second draft agreement that had been forwarded by counsel for Plaintiffs on July 14, 2005. In the July 25, 2005 e-mail Defendant's counsel also stated that he "sent [Plaintiffs'] revisions to my client, but have not received his comments yet." Pl. Ex. 1-L.

In an e-mail dated July 26, 2005, to Defendant's counsel Plaintiffs' counsel stated, "I've looked again at ... the draft license. As you suggested, we can agree to the original wording that excludes the text limiting the confidentiality agreement to 'a period of two years' after termination of the license. That is, the agreement on confidentiality would state: '... during the Term of this Agreement and thereafter.'" Plaintiffs' counsel further stated that "[h]opefully, this addresses all of the outstanding issues. Please let me know when you have had a chance to talk with your client." Pl. Ex. 1-M.

In an e-mail dated August 1, 2005, to Plaintiffs' counsel Defendant's counsel stated that he spoke with his client "on this and we do have two other issues to discuss." One issue was that Niagra Plastics was acquired by another company and that, therefore, the parties "need to make sure the licenses are correctly identified." The second issue was that "in paragraph 2, [Defendant wanted] to change the grant of rights to the United States only, instead of the rest of the world." Pl. Ex. 1-N. Defendant's counsel further stated in the August 1, 2005 e-mail that he looked forward to hearing from Plaintiffs' counsel. Pl. Ex. 1-N. The parties characterize the August 1, 2005 e-mail differently. Plaintiff contends that in it Defendant "proposed a counter-offer that affected only two terms of the Second Draft Written Agreement that had been circulated on July 14, 2005." Pl. Facts, ¶ 13. Defendant contends that the August 1, 2005 "was not a counter-offer"; that Defendant's counsel

never stated that the additional items were the only additional issues or that [Defendant] otherwise agreed to the draft agreement." Def. Resp. Pl. Facts, ¶ 13. (emphasis in original). The parties do agree that as of the August 1, 2005 e-mail Defendant did not communicate that there were issues other than those relating to the correct name of the parties to the Agreement and relating to the limitation of the licensed rights to the United States. Pl. Facts, ¶ 15; Def. Resp. Pl. Facts, ¶ 15.

In an e-mail dated August 2, 2005, to Defendant's counsel Plaintiffs' counsel stated, "[w]ith regard to your comments below, Frank [one of Plaintiffs' counsel] is making contact with each of the potential licensees. We will determine the proper parties (in light of the Niagra acquisition) and will discuss the geographic scope of the license. Frank or I will get back to you as soon as possible." Pl. Ex. 1-O. The parties' characterization of the August 2, 2005 e-mail differs. Plaintiffs contend that in the August 2, 2005 e-mail it "agreed to the first issue in [Defendant's] August 1, 2005 counter-offer." Pl. Facts, ¶ 16. Defendant contends that the e-mail was not a counter-offer and that Defendant's counsel never stated that the "additional issues were the only additional issues or that [Defendant] otherwise agreed to the draft agreement." Def. Resp. Pl. Facts, ¶ 16 (emphasis in original).

An e-mail dated December 12, 2005, from Plaintiffs' counsel to Defendant's counsel states as follows:

> Per our recent telephone conversation, attached below is the Agreement my clients have approved to settle this matter. You have seen this document before except for the changes I made this morning to paragraph 5 relating to Quality Control. I believe that the revised provision addresses the needs of our respective clients for this matter.
>
> Please review with your client and let's get this behind them. Call me if you have any questions/comments. I look forward to hearing from you shortly.

Pl. Ex. 1-P.

In the upper right hand corner of each page of the document sent via e-mail on December 12, 2005, appears word "**DRAFT.**" The quality control provision in the this document states as follows:

> Licensee agrees to maintain its standards of quality at the time of execution of this Agreement with regard to the Licensed Products presently marked or offered for sale, or subsequently marked or offered for sale. S&R acknowledges the overall quality of products produced, marketed or offered for sale by Licensee. From time to time, S&R may request samples of one item representative of the Licensed Products that are being, have been, or will be marketed or offered for sale by Licensee, but not more frequently than annually and not before the one year anniversary of this Agreement.

Pl. Ex. 1-P.

The parties disagree over the characterization of the document attached to the December 12, 2005 e-mail. Plaintiffs characterize it as "the Final Written Settlement Agreement." Plaintiffs further contend that this "Final Written Settlement Agreement" memorialized Defendant's August 1, 2005 counter-offer; that as of December 12, 2005 all issues communicated by Defendant's counsel were accepted by Plaintiffs; that the only additional change "circulated on December 12, 2005 related to the already agreed to quality control provision"; and that the quality control provision was a "non-material refinement." Pl. Facts, ¶ ¶ 18-20. Defendant contends that the document attached to the December 12, 2005 e-mail is not the "Final Written Settlement Agreement"; that it is a "revised draft settlement agreement"; that Defendant's characterization of the quality control provision as non-material is a legal conclusion rather than a factual conclusion; and that the parties never entered into any agreement. Pl. Resp. Def. Facts, ¶ ¶18-20.

Between December 12, 2005, and January 23, 2006, Defendant did not communicate disagreement regarding the document which was attached to the December 12, 2005 e-mail. In an e-mail dated January 23, 2006, to Plaintiffs' attorney Defendant's attorney stated as follows:

> I am writing to advise you that we have just learned something that may impact our ability to agree to the License Agreement with your four clients in the form originally discussed.

5

> As you know, the parties have been discussing a royalty-free license pursuant to which your clients would be entitled to produce and/or sell the "Licensed Products" -- which we have defined as "any products ... embodying the [clerical collar trade dress]". As you also know – but we just learned – your client Steere Enterprises entered into a Settlement and License Agreement with Sinclair & Rush on July 28, 1998, pursuant to which Steere received, among other things, a license to use the clerical collar trade dress for handgrips (but not for beverage containers) in return for payment of a 1% royalty. More importantly, the 1998 Agreement contained a "most favored licensee" clause that would require Sinclair & Rush to amend that agreement should it ever grant a license for the clerical collar trade dress for handgrips on better terms than a 1% royalty. Obviously, the royalty-free license that has been discussed in this matter is just such a license, and Sinclair & Rush is not willing to forego its 1% royalty from Steere just to settle this opposition proceeding.
>
> We were not counsel for Sinclair & Rush in its litigation with Steere, and just learned of the 1998 agreement (and its "most favored licensee" clause). I assume that you were aware of the Steere agreement - perhaps you have already considered this and can advise me how we might get around this apparent conflict between your clients. One option might be for your four clients in this opposition proceeding to agree to pay a 1% royalty for handgrips and take a royalty-free license for beverage containers. I don't know your clients' businesses, so I do not know whether such an arrangement would make sense for them.
>
> In any event, Frank, we obviously have an issue that needs to be dealt with expeditiously. Please give me a call at your earliest convenience to discuss.

Pl. Ex. 1-R.

By e-mail dated February 10, 2006, Defendant's counsel informed Plaintiffs' counsel that the former was informed by Defendant's general counsel that "the previous settlement negotiations between [their] respective clients have been terminated, and that this fact was communicated to you a week or so ago." Pl. Ex. 1-S.

After a telephone conference on February 16, 2006, between the parties' attorneys and the TTAB, the TTAB suspended the opposition proceeding to allow Plaintiffs, the opposers, time to file a complaint "to enforce the settlement agreement that opposers contend was reached between the parties." Pl. Ex. 1-T. On February 24, 2006, Plaintiffs filed the instant lawsuit in which they seek enforcement of the settlement Plaintiffs allege the parties reached on December 12, 2005. On March

6

21, 2006, the TTAB suspended the opposition proceeding pending resolution of the matter before this court.

The same counsel represented Defendant until after the opposition proceeding was suspended on March 21, 2006. Thereafter, Defendant obtained new counsel and the parties attempted to resolve the issue with regard to the Most Favored Licensee provision. By e-mail dated May 1, 2006, Plaintiffs' counsel informed Defendant that Steere had agreed to waive the "most favored licensee" provision.

## STANDARD FOR SUMMARY JUDGMENT

The Court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id. See also Fenny v. Dakota, Minn. & E.R.R. Co., 327 F.3d 707, 711 (8th Cir. 2003) (holding that an issue is genuine "if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party").

A moving party always bears the burden of informing the court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of his pleading. Id. at 256.

In passing on a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in its favor. Id. at 255; Raschick v. Prudent Supply, Inc., 830 F.2d 1497, 1499 (8th Cir. 1987). The court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. However, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." Id. at 252. With these principles in mind, the court turns to an analysis of Defendants' motions. "Factual disputes that are irrelevant or unnecessary" will not preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

**LEGAL FRAMEWORK**

1. State law governs the existence and enforceability of a settlement agreement. Visiting Nurse Ass'n, St. Louis, v. VNAHealthcare, Inc., 347 F.3d 1052, 1053 (8th Cir. 2003).

2. "Settlement agreements are favored by the courts" and courts have "the inherent power to enforce a settlement agreement." Caleshu v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 737 F. Supp. 1070, 1086 (E.D. Mo. 1990) (citation omitted). See also United States v. Mansion House Ctr., N. Redevelopment Co., 607 F. Supp. 392, 395 (E.D. Mo. 1985) (citing Leon Indus., Inc. v. I.C.N. Pharms., 472 F.Supp. 1241, 1242 (E.D. Mo.1979); DeWitt v. Lutes, 581 S.W.2d 941 (Mo. Ct. App.1979); Southwestern Bell Tel. Co. v. Roussin, 534 S.W.2d 273 (Mo. Ct. App.1976)). "Once parties have settled a dispute and have agreed to settlement terms, the parties cannot rescind it." Caleschu, 737 F. Supp at 395.

3. "Basic principles of contract formation govern the existence and enforcement of the alleged settlement." Chaganti & Assocs., P.C. v. Nowotny, 470 F.3d 1215, 1221(8th Cir. 2006) (citing In re Airline Ticket Comm'n Antitrust Litig., 268 F.3d 619, 623 (8th Cir.2001); Sheng v. Starkey Labs., 53 F.3d 192, 194 (8th Cir.1995)). See also Visiting Nurse Association,347 F.3d at 1053 ("[T]o

8

determine whether the parties entered into an enforceable settlement agreement we look to Missouri principles of contract formation."); Fiegener v. Freeman-Oak Hill Health Sys., 996 S.W.2d 767, 771 (Mo. Ct. App. 1999) ("Since settlement is a species of contract, it is governed by contract law."). Under Missouri law "[t]he essential elements of a valid settlement agreement are the involvement of parties who are competent to contract, a proper subject matter, legal consideration, mutuality of obligation, and mutuality of agreement." Chaganti, 470 F3d at 1221 (citing L.B. v. State Comm. of Psychologists, 912 S.W.2d 611, 617 (Mo. Ct. App.1995)). "In order to determine whether the parties intended to be bound by the settlement prior to the execution of the written documents, a court must consider the course of negotiations, agreement on material terms, whether the parties described the settlement as such, and whether any existing disagreements were merely technicalities.." Caleschu, 737 F. Supp at 1086 (citing Leon, 472 F. Supp. at 1242).

"It is a basic legal principle that mutual assent is necessary for the formation of a contract." Newman v. Schiff, 778 F.2d 460, 464 (8th Cir. 1985). Whether or not mutual assent is present, however, is not dependant "upon the state of the parties' minds; it depends on their overt acts." Id. See also Macy v. Day, 346 S.W.2d 555, 558 (Mo. Ct. App. 1961) ("It is elementary and fundamental that, to make a valid contract, '(t)he parties must have a distinct intention, common to both, and without doubt or difference' ... , and that the minds of the contracting parties must meet upon and assent to the same thing in the same sense and at the same time.") (citations omitted). A meeting of the minds is essential to bind parties to a settlement agreement. Chaganti, 470 F.3d at 1221. A court determines whether "such a meeting of the minds took place by 'looking to the intentions of the parties as expressed or manifested in their words or acts.'" Id. (quoting L.B., 912 S.W.2d at 617). "[T]meeting of the minds essential to a contract may not be found on the undisclosed assumption or secret surmise of either party but must be gathered from the intention of the parties as expressed or

9

manifested by their words or acts." Macy, 346 S.W.2d at 558 (citations omitted). Thus, it is the "parties' objective manifestations of intent" which "determine whether there was a 'meeting of the minds.' ... A person's subjective intent is irrelevant." Don King Equip. Co. v. Double D Tractor Parts, Inc., 115 S.W.3d 363, 369 (Mo. Ct. App. 2003) (citing Fiegener, 996 S.W.2d at 771.

A meeting of the minds or mutual assent is not established simply because one party fails to respond to another party's offer. See e.g., Donley v. Parker, 833 S.W.2d 480, 481 (Mo. Ct. App. 1992) (holding that there was no "legal significance" to a portion of a letter in which the plaintiff's attorney stated that unless notified otherwise, the plaintiff would "assume that this mutual agreement is acceptable"). Under such circumstances it cannot be said that there is unequivocal acceptance of an offer. Id. ("The creation of a contract requires a definite offer and an unequivocal acceptance.") (citing Around the World Importing, Inc. v. Mercantile Trust Co., N.A., 795 S.W.2d 85 (Mo. Ct. App. 1990)). Where there is "no agreement ... silence [can] not operate as acceptance to create one." Id. (citing C.J.S. Contracts § 41, p. 671 (1963)).

4.  Where parties agree on all material terms "[t]he fact that the parties left insubstantial matters for later negotiation ... 'does not vitiate the validity of the agreement reached.' " Trnka v. Elanco Prods. Co, 709 F.2d 1223, 1226 n.2 (8th Cir. 1983) (quoting Bergstrom v. Sears, Roebuck & Co., 532 F. Supp. 923, 932 (D. Minn.1982). Material terms are the essential terms of a contract and, hence, of a settlement agreement. See e.g., Fiegener, 996 S.W.2d at 772. That which is a condition of the transaction is a material term. Boatman's Nat'l Bank of St. Louis v. Dandy, 804 S.W.2d 783, 785 (Mo. Ct. App. 1990). See also Southern Missouri Dist. Council of Assemblies of God v. Hendricks, 807 S.W.2d 141, 146 (Mo. Ct. App. 1991) (holding that the "essential terms" of a contract include (1) the parties; (2) the subject matter; (3) promises by both sides; and (4)

consideration) (citing Ray v. Wooster, 270 S.W.2d 743, 752 (Mo. 1954); Three-O-Three Invs., Inc. v. Moffitt, 622 S.W.2d 736,738 (Mo. Ct. App. 1981)).

5.      "[P]arties to a voluntary settlement agreement cannot avoid the agreement simply because the agreement ultimately proves to be disadvantageous." Worthy v. McKesson Corp., 756 F.2d 1370, 1373 (8th Cir. 1985) (citing Trnka, 709 F.2d at 1227). Thus, one cannot rescind a settlement agreement simply because he "changes his mind." Id. (citing Fulgence v. J. Ray McDermott & Co., 662 F.2d 1207, 1209 (5th Cir.1981)).

## DISCUSSION

Plaintiffs in the matter under consideration seek to enforce the document e-mailed by Plaintiffs' counsel to Defendant's counsel on December 12, 2005, which document Plaintiffs contend is a binding settlement agreement. Doc 43; Doc. 54. Defendant contends the parties never reached an agreement. Alternatively, Defendant contends that even if it made an offer in August 2005 and even if Plaintiffs accepted this alleged offer on December 12, 2005, Plaintiffs' delay of four and half months is not reasonable. As such, Defendant contends that Plaintiffs did not accept Defendant's alleged offer within a reasonable time. Doc. 51.

Neither of the parties contend that they had an agreement prior to August 1, 2005. In the August 1, 2005 e-mail Defendant's counsel identified two issues which he said his client had and stated that he looked forward to hearing back from Plaintiffs' counsel regarding these issues. Defendant's counsel did not state, however, in the August 1, 2005 e-mail that his client did not have any other issues or that the two issues identified were the only issues remaining as far as his client was concerned. Indeed, contrary to Plaintiffs' assertion, Defendant's counsel did not insert the word "only" when referencing that it had "two other issues to discuss" in the August 1, 2005 e-mail.

11

In response to Defendant's counsel's August 1, 2005 e-mail, Plaintiffs' counsel sent the August 2, 2005 e-mail in which he said that he was addressing the issues raised in the August 1, 2005 e-mail and that he would get back to Defendant's counsel regarding these issues. Plaintiffs' counsel did not, however, provide Defendant with a written response until December 12, 2005, a period of over four months.[2] While Plaintiffs' counsel's December 12, 2005 e-mail indicates that Plaintiffs were agreeable to the settlement agreement attached to that e-mail, this e-mail acknowledges that Defendant had not approved the attached agreement; Plaintiffs' counsel acknowledged that Defendant's counsel had to review the proposed agreement with his client and that it was possible that Defendant would have questions or comments regarding the proposed settlement. The next communication between the parties was the January 23, 2006 e-mail in which Defendant's counsel advised Plaintiffs' counsel that other issues had arisen. Certainly, any delay on Defendant's part in responding to Plaintiffs' December 12, 2005 e-mail does not operate as assent. See Donley, 833 S.W.2d at 481. Most signficantly, the e-mail communications between the parties do not establish that the parties had reached an agreement at any point in their negotiations. The parties objective intent, as expressed in the e-mails exchanged by their counsel, establishes that there was not a meeting of the parties' minds in regard to the terms of a settlement agreement. See Chaganti, 470 F.3d at 1221; Don King, 115 S.W.3d at 368. Indeed, the undisputed facts establish that there was never a meeting of the parties' minds in regard to the terms of settling their dispute. See Macy, 346 S.W.3d at 558.

Moreover, even assuming, arguendo, that the parties had reached agreement on all other terms, Plaintiffs' attorney's e-mail of December 12, 2005 acknowledges that Defendant had not

---

[2] The December 12, 2005 e-mail suggests that the parties' respective lawyers spoke to one another just prior to Plaintiffs' counsel sending the December 12, 2005 e-mail.

approved the quality control language articulated in that e-mail. The December 12, 2005 e-mail further acknowledges that Plaintiffs' counsel made changes to the quality control language which language neither Defendant's counsel nor Defendant had seen. While Plaintiffs contend that this quality control provision is not a material provision, the court finds that, in the context of the licensing of a trademark in the matter under consideration, the standards for quality of the products is material; the terms of the proposed quality control provision evidence that Defendant foresaw quality control as a means for preserving the value of its mark. The context of the proposed quality control provision makes it clear that Defendant was concerned with insuring the "overall quality of products produced, marketed or offered for sale by" Plaintiffs and that without such assurance agreement could not be reached. As such, the court finds that the quality control provision was an essential term for settlement on Defendant's part and that, therefore, the quality control provision was material to a settlement agreement. See Fieger, 996 S.W.2d at 772; Boatman's Nat'l Bank, 804 S.W.2d at 785.

Even assuming, arguendo, that agreement had been reached regarding all issues other than quality control, because the parties had not reached an agreement regarding this material issue as of December 12, 2005, the document attached to the December 12, 2005 e-mail was not a final and binding settlement agreement; the undisputed facts establish that there was not a meeting of the minds on all material terms. See Worthy, 765 F.2d at 1373; Fiegener, 996 S.W.2d at 772; Boatman's, 804 S.W.2d at 785. Therefore, despite a policy which favors enforcement of settlement agreements, the court finds that the undisputed facts establish that the mutual assent necessary for the formation of a settlement agreement was never present in the matter under consideration. See Newman, 778 F.2d at 464; Caleschu, 737 F. Supp. at 1086; Macy, 346 S.W.2d at 558. Under such circumstances, the undisputed facts establish that, in the January 2006 e-mail, Defendant did not rescind a settlement to

which the parties had previously agreed. See Caleschu, 737 F. Supp. at 1086. Further, the court finds that the undisputed facts establish that Plaintiffs are not entitled to enforcement of what they contend is binding settlement agreement.

Because the undisputed facts establish that the parties had not agreed to all material terms of a settlement agreement prior to January 23, 2006, Defendant's reasons for advising Plaintiffs on that date that issues remained which had be to addressed prior to continuing settlement negotiations are not relevant to the matter under consideration. Further, because the court finds that the undisputed facts do not establish that the parties reached a final settlement agreement the court need not address other issues raised by the parties.

## CONCLUSION

For the reasons more fully set forth above, the court finds that Plaintiffs' Motion for Summary Judgment should be denied. As such, all issues raised in Plaintiffs' Complaint remain pending. [3]

Accordingly,

**IT IS HEREBY ORDERED** that the Motion for Summary Judgment filed by Plaintiffs is **DENIED**; Doc. 42

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
Dated this 5th day of April, 2007.   UNITED STATES MAGISTRATE JUDGE

---

[3] Count I of the Complaint alleges Trademark Invalidity and Unenforceablity, Count II alleges Antitrust Violations, Count III seeks Enforcement of Settlement Agreement, and Count IV alleges Breach of Contract. Plaintiffs' Motion for Summary Judgment addressed only Counts III and IV. Defendant has not filed a motion for summary judgment.